**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**KLLM TRANSPORT SERVICES, LLC**                                     **PLAINTIFF**

**vs.**                                   **CIVIL ACTION NO.: 3:12-CV-116-HTW-LRA**

**JBS CARRIERS, INC.**                                                            **DEFENDANT**

## ORDER

BEFORE THIS COURT is the defendant JBS Carriers, Inc.'s Motion to Remit Amount of Punitive Damages **[Docket no. 224]**. This motion stems from a years-long, extremely contentious litigation between the parties. After a careful review of the submissions of the parties, the relevant legal precedent, and the oral arguments of the parties, this court is convinced that JBS carrier Inc.'s Motion to Remit Amount of Punitive Damages **[Docket no. 224]** should not be granted for the reasons set forth below.

    **I.**     **BACKGROUND**

This case revolves around the termination of a "dedicated" hauling contract[1] and the breach of a settlement agreement. The salient background facts are as follows.

In 2008, KLLM Transport Services, LLC (hereinafter referred to as "KLLM"), an over-the-road trucking company based in Mississippi, entered into a dedicated hauling contract with Pilgrim's Pride Corporation (hereinafter referred to as "PPC"), a chicken processing company. In 2010, PPC allowed its sister company, JBS Carriers Inc. (hereinafter referred to as "JBS"), to perform the dedicated hauling services for the PPC/KLLM contract. JBS, though, also allegedly began poaching some of the KLLM employees who had worked on the PPC dedicated hauling

---

[1] This is a type of transportation contract where a non-transportation business hires a transportation company to transport its goods as if the transport company were a private company wholly-owned by the non-transportation company.

contract. Afterwards, an aggrieved KLLM sued JBS. KLLM contended that JBS had tortuously interfered with KLLM's business relationships, converted its proprietary trade secrets, and converted its customers. KLLM filed this lawsuit in this court, the United States District Court for the Southern District of Mississippi in case number 3:10-CV-546-HTW-LRA.

With the court's help and encouragement, the two parties ultimately settled their differences out of court on December 1, 2010. [Docket no. 1-2]. In the settlement agreement, JBS agreed as follows:

> The current contract between KLLM and Pilgrim's Pride shall be honored and continued for its stated duration and no early opt-out or termination of such contract will occur. KLLM will continue to provide services and pricing levels as stated in such contract.

[Docket no. 1-2, ¶ 5]. JBS further agreed that "JBS Carriers will not circumvent this Agreement or its obligations as set forth herein through any of its parent or affiliated companies." [Docket no. 1-2, ¶ 8].

Despite this settlement agreement, on December 13, 2011, PPC informed KLLM that it was terminating its dedicated hauling contract with KLLM. On February 17, 2012, KLLM filed this lawsuit in this federal court against JBS, contending that JBS had breached the settlement agreement in permitting PPC to terminate the dedicating hauling contract. [Docket no. 1]. In addition to compensatory damages, KLLM also requested punitive damages.

This matter was brought to trial on August 19, 2015, before a jury of eight persons. After nine (9) days of trial, on September 1, 2015, the jury began its deliberation and returned a verdict in favor of KLLM. The jury awarded KLLM $36,950.00 in contractual damages for JBS Carrier's breach of the settlement agreement. [Docket no. 216].

The next day, on September 2, 2015, that same jury heard the punitive damages phase of trial. During its closing argument in the punitive damages phase of the trial, KLLM argued that

JBS had violated the settlement agreement that it had entered into voluntarily just eleven months prior. KLLM also reiterated to the jury that JBS's counsel who penned the settlement agreement was the same attorney who terminated the KLLM-JBS contract less than a year later. JBS, said KLLM, terminated the contract to benefit itself because JBS's business was suffering and the PPC contract JBS took from KLLM doubled JBS's business. Just as KLLM had emphasized during the trial, KLLM characterized JBS' conduct as "reckless disregard for KLLM's rights." [Docket no. 223, P. 7].

JBS presented to the jury that PPC had decided to terminate KLLM's contract before they knew about the prior settlement agreement and that no JBS employees were involved in the decision to terminate KLLM's contract with PPC. The jury was not persuaded by JBS's arguments.

JBS also presented what it purported to be its balance sheet. According to this balance sheet, JBS had only $38,019.00 in cash-on-hand and a negative net worth of $71,702,835.00. [Docket no. 229, P. 27]. KLLM did not object to this document being admitted into evidence. KLLM, though, did question the veracity of this balance sheet, emphasizing in closing argument that JBS was "working for these other companies in the family that are huge companies. They've got money coming in. I submit that if you make the award, which I trust you to do with proper and sound judgment as the court instructed you, they will find a way pretty easily to pay it." [Docket no. 223].

The jury, after due deliberation, awarded KLLM $900,000.00 in punitive damages. [Docket no. 218].

## II. JURISDICTION

This court earlier confirmed that it possesses diversity of citizenship subject-matter jurisdiction over this dispute in its orders dated July 26, 2013 [Docket no. 137], and August 17,

2015 [Docket no. 204]. Inasmuch as diversity of citizenship is the subject matter jurisdictional trigger, this court, sitting in Mississippi, will apply Mississippi law to the substantive issues in accordance with the *Erie* Doctrine. *Erie v. Tompkins*, 304 U.S. 64, 78-79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under the *Erie* Doctrine, federal courts sitting in diversity must apply state substantive law and federal procedural law. *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (*citing Gasperini v. Ctr. for Humanities, Inc*., 518 U.S. 415, 426-427 (1996)).

### III. MOTION TO REMIT AMOUNT OF PUNITIVE DAMAGES [Docket No. 224]

#### a. *Mississippi Punitive Damages Law*

Defendant JBS first asks this court to remit the amount of damages the jury awarded to KLLM to zero ($0.00), allegedly in accordance with Mississippi law. JBS travels under MISS. CODE ANN. § 11-1-65(3)(a), which authorizes the reduction of a plaintiff's punitive damages award depending on the net worth of the defendant. Section 11-1-65 (2004) recites:

> In any civil action where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed the following:
> (vi) Two percent (2%) of the defendant's net worth for a defendant with a net worth of Fifty Million Dollars ($50,000,000.00) or less.

This limitation on punitive damages "shall not be disclosed to the trier of fact." MISS. CODE ANN. § 11-1-65(3)(c). In other words, the jury deliberates in the blind relative to the possibility that, under the law, the court may be required to reduce the award dependent on the net worth of the defendant.

The statute further mandates that "[f]or the purposes of determining the defendant's net worth in paragraph (a), the amount of the net worth shall be determined in accordance with Generally Accepted Accounting Principles." MISS. CODE ANN. § 11-1-65(3)(b). Generally Accepted Accounting Principles are acceptably defined as "the official standards adopted by the

4

American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 573, fn. 11 (S.D. Tex. 2002)(*citing In re K-tel Intern., Inc. Securities Litigation*, 300 F.3d 881, 889 (8th Cir.2002), quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n. 4 (2d Cir.2000)).

JBS contends that KLLM now may not present any argument or evidence contradicting JBS' balance sheet, especially the negative net worth, because KLLM did not present challenging evidence at trial before the jury. In support of this argument, JBS cites two cases: *C & C Trucking Co. v. Smith*, 612 So.2d 1092 (Miss. 1992) ("Smith") and *Coleman & Coleman Enter., Inc. v. Waller Funeral Home*, 106 So.3d 309 (Miss. 2012) ("Coleman"). This court, though, is not persuaded that these two cases bemuscle JBS' position.

*Smith* is a 1992 case that was decided before the Mississippi Legislature adopted the punitive damages scheme described in MISS CODE ANN. § 11-1-65. In *Smith*, the plaintiff appealed the trial court's decision to remit the jury's punitive damages award from $50,000.00 to $0.00. *Id*. The trial court based its remittitur on the defendant's argument that the jury had not been informed of the defendant's net worth, which was $0.00. *Smith*, 612 So.2d at 1105.

> The Mississippi Supreme Court reversed the trial court's remittitur, announcing:
>
> We hold that it is not legally necessary for either plaintiff or defendant to introduce evidence of the net worth of the defendant during the trial to support an award of punitive damages. If, however, no such evidence is presented, neither party may challenge on appeal either the inadequacy or the excessiveness of a punitive damages award. If a party wishes to preserve the question for appeal, evidence of net worth must be presented at trial, or error in the amount of punitive damages is waived.

*Id*. at 1105.

Unlike *Smith*, *Coleman*, a 2012 case, was decided after the Mississippi Legislature adopted the punitive damages scheme described in MISS. CODE ANN. § 11-1-65. During the punitive phase in *Coleman*, the counter-defendant, Coleman, speculated that it "had little or no net worth" and that it "had some measure of outstanding debt." Coleman further represented that it had no equity in the funeral home. The counter-plaintiff, Waller, conducted no cross-examination on this point. Regardless of Coleman's representations of negative net worth, the jury awarded Waller $25,000.00 in punitive damages. *Coleman*, 106 So.3d at 313.

After the trial, while still in front of the Circuit Court of Lafayette County, Coleman filed a motion for remittitur, presenting, for the first time, proof of its negative net worth in the form of a balance sheet, a profit and loss statement, and affidavits from its accountant and principals. *Id*. at 319. Waller objected to the motion for remittitur, claiming that this evidence of negative net worth should have been disclosed during discovery or at trial, as described in Smith. *Id*. 319-20.

The trial court rejected these arguments, took into consideration Coleman's negative net worth, and reduced the punitive damages award to $0.00, stating:

> [T]he Court finds that the jury's punitive damages award of $25,000.00 against [Coleman] is reasonable in its amount, rationally related to the purpose of punishing the conduct giving rise to the award and of deterring its repetition, and not excessive. However, the Court also finds that [Coleman] has a net worth of – [minus] 78,112.00 and that, pursuant to MISS. CODE ANN. § 11-1-65(3)(a), the jury's award of punitive damages against [Coleman] must be reduced to $0.00.

*Coleman*, 106 So.3d at 319-20.

The Mississippi Supreme Court agreed with the trial court, stating "both parties are charged with either presenting evidence of net worth, or waiving their right to challenge the amount of punitive damages. Because Waller failed to adduce proof of Coleman's net worth during the punitive phase, it cannot now complain of the reduced verdict." *Id*. at 320 (emphasis added).

The Mississippi Supreme Court in *Coleman*, apparently contemplated a "punitive phase," during which the parties could present evidence of a defendant's net worth. As the facts in *Coleman* suggest, this punitive phase does not end upon a jury's determination to grant or deny punitive damages; the Circuit Court of Lafayette County permitted Coleman to present evidence of his negative net worth in a post-trial motion. *Id*. at 319-20. Moreover, the Mississippi Supreme Court denied Waller's punitive damages appeal, not because Waller failed to produce evidence to the jury of Coleman's net worth, but because, when confronted with Coleman's alleged negative net worth in a post-trial remittitur motion, Waller "failed to adduce proof of Coleman's net worth," thus forming no record for the appellate court to review. *Id*. at 320. Accordingly, the punitive phase appears to extend beyond the jury's verdict to post-trial, pre-appeal motions for remittitur.

Such seems to be the intent of MISS. CODE ANN. § 11-1-65, which requires a court to contemplate the reasonableness of a jury's award of punitive damages before entering a judgment. Thus, the punitive phase does not end with the jury's award, but with the trial court's determination that the jury's award is reasonable and in compliance with Mississippi law. Guided by the above jurisprudence and logic, this court is persuaded that KLLM may present evidence in opposition to JBS' motion for remittitur.

KLLM challenges JBS' balance sheet as not being in compliance with Generally Accepted Accounting Principles (hereinafter referred to as "GAAP")[2]. As earlier mentioned, Mississippi law requires that the net worth of a defendant be determined in accordance with GAAP. MISS. CODE ANN. § 11-1-65(3)(b); *See Sandoz, Inc. v. State of Mississippi*, 190 So.3d 829 (Miss. 2015).

---

[2] The measurement and disclosure principles that apply to all financial statements (except those prepared on another comprehensive basis of accounting). GAAP governs the recognition and measurement of transactions and dictates the amounts and other information that must be presented in financial statements.
Steven Lindsey & Marilyn Rutledge, PPC'S GUIDE TO GAAP (12th ed. 2014).

7

According to KLLM's expert, Robert Anderson ("Anderson"), the Director of Fraud, Forensic, and Litigation Services for Horne LLP[3], JBS' balance sheet is not in compliance with GAAP because the entry of accounts receivable[4] distorts JBS' net worth. "Accounts receivable" represent the money (i.e., lines of credit) that customers owe to an entity in exchange for goods or services.[5] Therefore, accounts receivable should be an asset of the company. [Docket no. 229, P. 15, *SEALED*].

Anderson, though, observes that JBS has a negative accounts receivable balance of $91,323,473. This entry, says Anderson, is not in accordance with GAAP, as he explains below:

> A negative receivable does not represent money owed by customers or others to JBS, but instead represents money owed by JBS to others. By definition, a negative receivable is not a receivable (or an asset), but is the opposite of a receivable, which would be a liability or, in this case, possibly equity. Recording a liability or equity as a negative asset, as JBS has done, is not in accordance with GAAP.

[Docket no. 229]. Anderson further opined that this negative accounts receivable represent a cash infusion from JBS' parent company to capitalize JBS' operation. *Id*. Once the entry is reclassified as an equity, contends Anderson, JBS will have a positive net worth.

Moreover, in the absence of these cash infusions, says Anderson, JBS could not operate because, Anderson emphasizes, according to its balance sheet, JBS has only $38,019.00 cash-on-hand. Indeed, it is puzzling how JBS could manage a fleet of eight hundred (800) trucks with so little capital. It appears that the jury reached the same conclusion during its deliberation, in spite

---

[3] "Horne [LLP] is a top 50 CPS firm which offers industry-focused accounting and business advisory services." Horne LLP is a foreign Limited Liability Partnership in good standing with the Mississippi Secretary of State. Its registered agent, Wendy Eversole, and main office in Mississippi are in Ridgeland, Mississippi.

[4] An account receivable reflects the amount "owed by a customer to an enterprise for goods and services." BLACK'S LAW DICTIONARY (10th ed. 2014).

[5] - account receivable (usu. pl.)(1936) An account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services. — Often shortened to receivable; receivables. — Also termed note receivable; bill receivable. Pl. accounts receivable.
ACCOUNT, Black's Law Dictionary (10th ed. 2014)

of JBS' disclosure of this balance sheet, and its alleged attendant negative net worth. The jury clearly disbelieved JBS.

JBS further failed to refute the testimony of KLLM's expert and show how its net worth at the time of the punitive damages award was in compliance with GAAP. This court, therefore, must accept Anderson's testimony as unrefuted and finds that JBS did not present a GAAP-compliant balance sheet.

Accordingly, this court declines to remit the jury's award of punitive damages to $0.00, finding that JBS' balance sheet is not compliant with GAAP, thus running afoul of the mandate of Miss. Code § 11-1-65(3)(b).

### b. *Due Process Clause of the United States Constitution*

As an alternative argument, JBS argues that this court should remit the jury's award of punitive damages because the award of $900,000.00 is contrary to the dictates of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which prohibits the imposition of a punishment that is "grossly excessive" when compared to the wrongdoing. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Three considerations guide the court in determining whether a punitive damages award is grossly excessive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Although the United States Supreme Court repeatedly has declined to create a mathematical formula or bright-line ratio for assessing punitive damages, that Court observed that,

"few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *Id*. at 424-25. The *Campbell* court, however, went on to state that, in some cases, a larger ratio indeed may comport with Constitutional Due Process:

> [B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)]. (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."

*Id*. at 425.

1. Reprehensibility

Turning to the facts of this case, this court now considers the first element: reprehensibility. An important factor in determining the reasonableness of a particular award of punitive damages is the "enormity" of the defendant's offense. *Gore*, 517 U.S. at 575. Some wrongs are simply more blameworthy than others. *Id*. The United States Supreme Court has suggested that violent offenses are more reprehensible than nonviolent offenses; that acts of fraud or deceit are more reprehensible than negligence; and that "repeated misconduct is more reprehensible than an individual instance of malfeasance." *Id*. 575-77.

KLLM's damages *sub judice* are entirely economic, resulting from PPC's decision to end its business relationship with KLLM, in breach of JBS' guarantee that PPC would not cancel its contract with KLLM early.

JBS has proved itself to be a recidivist. The settlement agreement, in which JBS guaranteed that PPC would not terminate its contract early (so long as KLLM did not provide PPC with a for-cause reason to terminate the contract), was the result of a lawsuit KLLM filed with this federal

forum because JBS had taken the PPC contract from KLLM and poached KLLM's employees. About a year after this settlement agreement, though, PPC terminated its contract with KLLM, citing an at-will provision of the contract for its termination of KLLM's contract which this court held was invalidated by the settlement agreement in its July 26, 2013 order. [Docket no. 137, P. 9-10]. After KLLM's termination, PPC began using the services of JBS for the same contract.

JBS and PPC are sister companies in the JBS family. JBS was struggling financially. As a result of its financial difficulties, JBS intentionally breached the settlement agreement it had made around eleven (11) months prior. The jury did not credit JBS's argument that PPC unilaterally made the decision to terminate its contract with KLLM, without first consulting JBS, or without knowledge of the settlement agreement between JBS and KLLM. The jury, instead, found that the same attorneys who penned the settlement agreement JBS violated, also penned the termination letter for the contract between KLLM and PPC.

This court and jury are particularly vexed with JBS's disregard for the sanctity of the justice system by voluntarily entering a settlement agreement to end KLLM's lawsuit against it and then immediately violating the terms of that settlement agreement. KLLM proved the settlement agreement, its terms and even provided evidence of the backdrop relationship between the parties. Further, KLLM presented to the jury what it considered to be JBS's motives for wrongdoing KLLM in both instances: money; greed; and total disrespect towards KLLM.

Then, the jury had before it JBS' use of a conceivably fraudulent balance sheet which JBS presented as being in compliance with GAAP during the remittitur phase of this litigation. Viewing this submission as unpersuasive (deceptive, even), KLLM argued to the jury as follows: 1. that until closing arguments it had not seen this balance sheet; 2. no witness had testified about its accuracy; and 3. that common sense dictated that a company the size of JBS could not survive on

such a sparse amount of capital. To emphasize this latter point, KLLM promised the jury that if the jury made a substantial award against JBS, JBS would find a way to satisfy that award, no matter how huge.[6]

Given JBS' repeated conduct and its disregard for KLLM and the courts, this court views JBS' actions in this case as more reprehensible than those displayed in the average case involving solely economic damages.

2. Ratio Between Punitive and Compensatory Damages

This court now turns to the second factor: the ratio between punitive damages and economic damages. The jury awarded KLLM $900,000.00 in punitive damages and $36,950.00 in compensatory damages. That is a ratio of approximately 24 to 1. KLLM, though, contends that this court should consider attorney fees as part of the compensatory award. If calculated into the compensatory award, the attorney fees, which KLLM contends exceeds $1 million, would result in an award closer to a 1:1 ratio.

KLLM points to *Theobald v. Noser*, 752 So.2d 1036 (Miss. 1999) for the proposition that attorney fees should be considered as part of damages. In *Theobald*, the Mississippi Supreme Court confirmed an award of attorney's fees because the underlying contract provided: "[i]f this Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of

---

[6] The actual language used by KLLM's attorney in his closing argument is as follows:
> This net worth statement, first time I've ever seen it. There's no witness here to verify it. I don't know how accurate it is. It looks like there's at least $7 million in equity in the company, but that's a quick review. And so without a witness here to verify it, I'm not sure.
>
> But I will submit to you, ladies and gentlemen, that the factors the court told you about, it doesn't say that because net worth is negative you can't award punitive damages. You may make an award of punitive damages, ladies and gentlemen. You know what kind of work they're doing. You know that they're working for these other companies in the family that are huge companies. They've got money coming in.
>
> I submit that if you make the award, which I trust you to do with proper and sound judgment as the court instructed you, they will find a way pretty easily to pay it. Thank you again for your time, and I wish you all the best in the future.

[Docket no. 223, P. 14, LL. 6-21].

collection, including reasonable attorney fees." *Id*. at 1042. The court in *Theobald*, though, only confirmed that parties in a breach of contract case may recover attorney fees if the contract provided for such. *Id*. *Theobald* makes no sweeping statements that attorney fees should be considered part of a compensatory award.

The United States Supreme Court has refused to view attorney fees as automatically part of a damages award. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (finding that, as a general matter, attorney fees are not compensatory damages because they are not part of the merits of an action); *see also Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, ---U.S.---, 134 S.Ct. 773, 780, 187 L.Ed.2d 669 (2014) (rejecting the contention that "contractual attorney's fees provisions are always a measure of damages").

Indeed, Mississippi jurisprudence on this point generally rejects the idea that attorney fees constitute damages. In *Grisham v. Hinton*, 490 So.2d 1201, 1207 (Miss. 1986), the Mississippi Supreme Court concluded that attorney fees "cannot properly be classified as damages because they are too remote from the wrong done, are not reasonably foreseeable as flowing from the act of the defendant, and accrue only after the cause of action is complete." *Id*. at 1207. The Mississippi Supreme Court, though, has suggested that, in rare cases, attorney fees may be awarded as compensatory damages. For instance, if an insurer fails to defend an insured, as required by a policy, attorney fees "may be awarded [to] the insured as contract damages in a subsequent action against the insurer." *Id*.

This case is not a subsequent lawsuit to recover attorney fees, where the attorney fees are the object of the litigation and their recovery constitutes actual damages. *Id.; see also Howard v. Clanton*, 481 So.2d 272, 276-77 (Miss. 1985). This case, instead, is one to recover damages

13

associated with a breach of contract. That the contract provides for an award of attorney's fees does not make those fees compensatory. Accordingly, this court does not consider attorney fees to be part of KLLM's compensatory damages.

This court adds an additional point. KLLM's submission of a 1 to 1 ratio presumes this court will award attorney fees around one million dollars (~$1,000,000.00). This court has made no such pronouncement, and might not reach the vicinity of that number. The court's determination of attorney's fees will be published shortly.

Because attorney fees (regardless of the amount this court eventually will award) are not a part of KLLM's compensatory damages, this court must compare the $36,950.00 award of compensatory damages to the $900,000.00 in punitive damages. This court, then, finds the ratio of compensatory to punitive damages awarded by the jury in this lawsuit is 1:24.

3. Comparison to Similarly Situated Cases' Awards Ratios

This court now turns to considering punitive damages awards in similar cases. In many of the breach of contract or breach of settlement agreements this court reviewed, courts have awarded a ratio between 1:3 to 1:5 of compensatory to punitive damages. *See, Kirby v. Johnson*, 204 Fed.Appx. 139 (3d Cir. 2006) (confirming a 1:4 compensatory to punitive award where one party, a buyer who had signed a lease-purchase agreement with regard to a truck, removed the truck from the seller's lot and ceased to make payments on the truck); *Konvitz v. Midland Walwyn Capital, Inc.*, 129 Fed.Appx. 344 (9th Cir. 2005) (reducing a jury award to a ratio of 1:5 compensatory to punitive damages, finding that a 1:5 ratio was appropriate where the harm was primarily economic, no acts of recklessness occurred, and the target of the conduct was not financially vulnerable); *Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, 298 F.Supp.2d 746 (N.D. Ill. 2004) (where the defendant had repeatedly engaged in tortuous acts against the plaintiff, the

14

court found the jury's award of a 1:3.4 ratio of compensatory to punitive damages appropriate); *Watkins v. Lundell*, 169 F.3d 540 (8th Cir. 1999) (limiting punitive damages in a breach of settlement agreement to a ratio of 1:4 compensatory to punitive damages); *but see CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184 (3d Cir. 2007) (in a breach of a non-compete clause case, the court reduced the jury's punitive damages award to a 1:7 ratio).

This court, however, also found cases where the ratio was much higher: *Watson v. Johnson Mobile Homes et al*, 284 F.3d 568 (5th Cir. 2002)(5th Circuit reduced the jury's original punitive damages award from $750,000 to $150,000 in a predatory lending case: the jury also awarded $4,000 in compensatory damages: the ratio, after remittitur, was 1:38); *Paracelsus Health Care Corp. v. Willard*, 754 So.2d 437 (Miss. 1999)(the Mississippi Supreme Court applied the *Gore* factors to a purely economic damages case and found that a ratio of 1:150 and 1:43, for two different plaintiffs, did not run afoul of the Constitution); *Cook Timber Co. v. Georgia-Pacific Corp.,* 194 So.3d 118 (Miss. 2016)(the Mississippi Supreme Court, after applying the *Gore* factors, affirmed a jury verdict of $11,089 in compensatory damages and $2,500,000 in punitive damages, ratio of 1:227); and *Booth v. Pre-Paid Legal Services Inc.,* 2005 Jury Verdicts LEXIS 43971 (Holmes County, MS 2005)(a case where the plaintiff alleged economic damages only, no physical injury, the jury awarded $40,000 in compensatory damages and $9,900,000 in punitive damages, a ratio of 1:248)(Appeal dismissed by Mississippi Supreme Court 2005 Miss. LEXIS 708).

In reviewing the cases, this court found those cases which reduced the punitive damages awards most significantly are not Mississippi cases, nor are they even from the Fifth Circuit. This court finds the Fifth Circuit's decision in *Watson v. Johnson Mobile Homes et al*, 284 F.3d 568 (5th Cir. 2002) most analogous, where the court finally allowed a ratio of 1:38. In *Watson*, the court found that the plaintiff had approached a mobile home dealer to purchase a mobile home and given

15

the dealership $4,000 down, pending a final approval from a financing company. The agreement between the parties was that the $4,000 was non-refundable in the event that the plaintiff reneged on the contract. It was refundable, however, if the defendant could not secure financing for the plaintiff, a circumstance which ultimately occurred. The plaintiff attempted multiple times to secure the refund of her $4,000. The defendant eventually told the plaintiff that she would have to get a lawyer to receive a refund. After a jury trial on the merits, the jury awarded the plaintiff $4,000 in compensatory damages and $700,000 in punitive damages: a ratio of 1:175.

The *Watson* court applied the *Gore* factors and found that where a jury awarded $4,000 in compensatory and $700,000 in punitive damages, the ratio was constitutionally infirm. During its analysis, the *Watson* court reiterated that, "[p]reying on the relatively unsophisticated, charging an exorbitant deposit, refusing to return the deposit once the application was rejected, using the $4,000 to wrest a better deal" were the sort of conduct that is particularly reprehensible and supports a punitive damages award. *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 572 (5th Cir. 2002). The court, however, then concluded that "we do not see a pattern of malfeasance on [the Defendants'] part, nor did Defendants act in such a way that [the Plaintiff's] health and safety were put at risk." *Id.* at 574.

The *Watson* court then reduced the punitive damages to $150,000 stating that "this amount is the maximum [the court] could sustain in this case." *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 574 (2002). (Followed by *Wellogix, Inc. v. Accenture*, LLP, 823 F. Supp. 2d 555, 573 (S.D. Tex. Oct. 14, 2011)(Finding that a 1:2.6 ratio was not constitutionally infirm). Thus, the ratio of compensatory to punitive damages approved by the Fifth Circuit was 1:38, a figure higher than the 1:24 present in the lawsuit *sub judice*.

This court, therefore, is persuaded that Mississippi's punitive damages jurisprudence clearly allows for multiple digit ratios. This court is also persuaded that the Fifth Circuit jurisprudence on this matter is consistent with this court's finding that the ratio between the compensatory and punitive damages awarded by the jury in this matter is not "grossly excessive".

### c. Conclusion

This court has reviewed the relevant jurisprudence, the arguments of counsel, submissions of the parties, and after applying the *Gore/ Campbell* factors[7] to this case, this court is persuaded to deny JBS's Motion for Remittitur. [Docket no. 224] This court finds that JBS's actions were reprehensible, and evinced conduct which cannot be condoned by any court. A party's actions in unilaterally disavowing its own agreement with the court and the opposing party show a clear lack of disregard for the court and indeed the legal system itself.

In the first iteration of the JBS and KLLM litigation, the parties reached an agreement to settle that case. Just under a year later, JBS, decided it did not have to, nor would it, abide by its own agreement and acted with malice and reckless disregard for the financial damage it was causing to another party, KLLM. This is clear and convincing evidence of recidivist behavior.

The extremely short time frame in which JBS decided to breach the settlement agreement between the parties is remarkable; JBS has shown a clear lack of respect for the justice system in general and this court in particular.

This court also finds that the ratio that the jury awarded in this case is not "grossly excessive". After reviewing similarly situated state cases and awards, this court has determined that *Watson* is similarly postured in that both cases are about a bad faith breach of contract and the damages in both cases were economic in nature. The jury, here, found JBS to be a recidivist by

---

[7] See Pages 9-10 of this opinion.

violating contracts it had with KLLM, not once, but twice in two years, even after KLLM requested and obtained this court's intervention for the first violation. Accordingly, this court finds that the jury's punitive damage award was not "grossly excessive".

### IV.     CONCLUSION

This court has presided over this tumultuous and extremely contentious litigation for many years and is convinced that JBS's litigation tactics caused this case to drag on for far longer than it needed to do so. Moreover, a jury found that JBS acted with malice in violating its settlement agreement with KLLM. This court is persuaded that JBS's reckless disregard for KLLM warrants a punitive damages award and that the jury's award was not "grossly excessive".

IT IS THEREFORE ORDERED AND ADJUDGED that JBS Carriers, Inc.'s Motion to Remit Amount of Punitive Damages **[Docket no. 224]** is hereby DENIED.

**SO ORDERED AND ADJUDGED** this 22nd day of December, 2017.

s/ HENRY T. WINGATE_____
UNITED STATES DISTRICT COURT JUDGE